## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Midwest Construction & Distribution
Industry Benefit Trust,

        Plaintiff,

    v.

Ferguson Enterprises, Inc.,

        Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 14-853 ADM/HB

_____

Mychal A. Bruggeman, Esq., Manty & Associates, P.A., Minneapolis, MN, on behalf of
Plaintiff.

Noah Lipschultz, Esq., Littler Mendelson, PC, Minneapolis, MN, on behalf of Defendant.
_____

## I.  INTRODUCTION

On April 14, 2015, the undersigned United States District Judge heard oral argument on

Plaintiff Midwest Construction & Distribution Industry Benefit Trust (the "Fund") and

Defendant Ferguson Enterprises, Inc.'s ("Ferguson" or the "Company") cross-motions for

summary judgment [Docket Nos. 20, 29].  The parties dispute whether certain Ferguson

employees were eligible to waive or opt out of health insurance benefit coverage under the Fund

and, as a result, whether Ferguson was required to make contributions to the Fund on behalf of

these individuals.  For the reasons set forth below, each motion is granted in part and denied in

part.

## II.  BACKGROUND

### A.  The Parties

Ferguson, a Virginia Corporation, operates as a wholesale distributor of piping and

plumbing supplies in Minnesota.  Draper Decl. [Docket No. 32] ¶ 1.  The Fund (formerly known

as the "Minneapolis and Suburban Lumber Dealers Trust Medical, Dental, Life & AD&D

Benefit Plan") is a multi-employer welfare benefit trust fund that provides coverage for the union

employees of less than ten local employers in the construction industry.  Compl. [Docket No. 1]

¶ 1.

**B.  The Governing Documents**

    **1.  Collective Bargaining Agreement**

On October 5, 2007, Ferguson and the union representing shipping/receiving and drivers

at Ferguson's Plymouth, Minnesota location (Teamsters Local No. 120) ("Union"), entered into

a collective bargaining agreement entitled "Agreement Between Teamsters Local No. 120 and

Ferguson Enterprises, Inc." (the "CBA").  Draper Decl. ¶ 2; Compl. ¶ 3.  The CBA governs the

benefits, rights, and conditions of Ferguson's union employees.[1]  Bruggeman Aff. [Docket No.

27] Ex. 3 (the "CBA").

Paragraph 15 of the CBA sets forth the health and welfare benefits provided for union

employees:

> The Company agrees to continue to participate in the Minneapolis and Suburban
> Lumber Dealers Trust Medical, Dental, Life & AD&D Benefit Plan at its current
> benefit levels . . .
>
> > A.  All benefits set forth in this section shall fall under the <u>Minneapolis
> > and Suburban Lumber Dealers Trust Medical, Dental, Life & AD&D
> > Benefit Plan</u>, hereinafter referred to as the "Trust."  The Employer shall
> > provide group insurance benefits for each regular employee who has
> > worked for the Company seventy-five (75) calendar days or longer.  Such

---

[1] The period of the health and welfare benefits plan described in the CBA was stated as
2007 until 2011.  However, Ferguson and the Union continue to operate under the CBA.
Bruggeman Aff. [Docket No. 27] Ex. 4 ("Draper Dep.") 48:20–49:5.

coverage to start the first of the month closest to the seventy-five (75) day period. . . . Such coverage shall be as set forth in the Trust.

C. The Employer will pay a portion of the premium for the Trust identified in section A above as follows:

(1) Effective June 1, 2007:  $683 per month per employee
(2) Effective August 1, 2008:  $704 per month per employee
(3) Effective August 1, 2009:  $725 per month per employee
(4) Effective August 1, 2010:  $747 per month per employee
(5) Effective August 1, 2011:  $769 per month per employee

**2. Trust Agreement**

The Minneapolis & Suburban Lumber Dealers Trust Agreement (the "Trust Agreement") sets forth the duties of the Fund trustees, who manage the Fund with the plan administrator.  Bruggeman Aff., Ex. 5 (the "Trust Agreement") §§ 1.3, 5.1.  Gerard Melgaard, Greg Skagerberg, and William Weber serve as trustees for the Fund.  See generally Melgaard Aff., Skagerberg Aff., Weber Aff. [Docket Nos. 24–26].  Article 3.8 of the Trust Agreement specifies the authority of the Trustees to manage the Fund:

Trustees are hereby authorized to specify the date on which contributions to the Trust are due.  The Trustees shall have the power to demand, collect, and receive Employer contributions and all other money and property to which the Trustees may be entitled, and shall hold the same until applied to the purposes provided in this Trust Agreement and the Plan.

Trust Agreement § 3.8.  The Trust Agreement also sets forth the operational aspects of the Fund and addresses the composition of the Board of Trustees.  Finally, the Trust Agreement specifies that "[e]ach Employer shall be responsible only for the contributions it is obligated to make under the Plan on behalf of its respective Covered Individuals."  Id. § 3.6.  The Trust Agreement defines "Covered Individuals" as "a person covered under or otherwise entitled to benefits under the Plan" and "Plan" as "the Minneapolis & Suburban Lumber Dealers Welfare Benefit Plan."

Id. §§ 2.2, 2.7.

**3. The Summary Plan Document ("SPD")**

The "coverage, eligibility, and limitations" of health and welfare benefits referenced in the CBA are found in the Summary Plan Description and Plan Document for the Minneapolis & Suburban Lumber Dealers Welfare Benefit Plan. Bruggeman Aff. Ex. 12 ("SPD").[2] The SPD provides the details of the medical coverage offered and the rules of eligibility, enrollment, and participation in the Fund. Relevant here are several SPD provisions that reference a right to waive coverage under the Fund. Section 1.1.(a)(1) of Section II states:

> Unless you waive coverage as provided in Section II (1.2) of this Part Two, enrollment in the Plan (all portions) is automatic as of the date the eligibility requirements set forth in Part II: Eligibility, Enrollment & Participation, Section 1: Eligibility, are satisfied . . . . **Caution**: if you waive coverage at your initial eligibility, you may enroll in the Plan only if a "special enrollment" situation occurs.

SPD Section II, § 1.1(a)(1) (emphasis in original). Section Two further provides that:

> **Coverage Waiver**: An Eligible Employee may decline coverage ("waive") under the Plan. Such an Eligible Employee shall be provided with the appropriate notice required under HIPAA regarding waiver of group health coverage.
>
> **Caution:** If you waive coverage, the only way you and/or your dependents can later be enrolled is if a special enrollment event occurs as described above.

Id. Section II, § 1.2. Finally, Section 1.2 of Section III specifies the effective date of coverage under the Fund:

> For those Employees that do not waive coverage upon first becoming eligible for coverage, the effective date of coverage is the first day of the calendar month following or coinciding with your satisfaction of the eligibility requirements under Part Two: Eligibility, Enrollment & Participation, Section 1: Eligibility, provided any enrollment forms required by the Plan Administrator have been

---

[2] It is undisputed that this document is referred to as the "Trust" in the CBA.

completed and received by the Plan Administrator.

Id. Section III, § 1.2.

On March 7, 2014, the Trustees amended the SPD to remove language allowing waiver. Section 1.2 was deleted in its entirety and Section 1.1(a)(1)'s "automatic enrollment" provision was altered to remove any "waiver of coverage language." Lipschultz Decl. [Docket No. 35] Ex. 8 to Skagerberg Dep. ("SPD Amendment"). The previous SPD stated that enrollment was automatic "unless you waive coverage as provided in Section II (1.2) of this Part Two." In contrast, the amended version states that "Enrollment in the Plan (all portions) is automatic as of the date the eligibility requirements set forth in Part II: Eligibility, Enrollment & Participation, Section I; Eligibility, are satisfied." Id.

## C. Coverage for Individuals at Issue

This action relates to unpaid contributions for seven Ferguson employees covered under the CBA. William Lilya opted out of coverage in 2003 and the remaining six employees waived coverage upon their hire with Ferguson between 2012–2013.

### 1. William Lilya

In October 2003, union member William Lilya opted out of Fund coverage when he elected to obtain coverage through his spouse's insurance plan. Lilya Decl. ¶ 4 [Docket No. 33]. Lilya's union representative, Jon Stoekmann, contacted the plan administrator who forwarded a form for Lilya to complete to document his opt-out of coverage. Id. Lilya completed and returned the form to the Fund. Id. After submitting the form, Lilya "did not receive any communication at all from the Plan." Id. In November 2003, Ferguson submitted a monthly remittance report to the Fund, specifying that Lilya had waived coverage and no premium

contributions would be made on his behalf.  Bruggeman Aff., Ex. 10 ("Remittance Report") and Ex. 11 "Wagner Dep." 21–24; Second Bruggeman Aff. [Docket No. 39] Ex. 2 "Melgaard Dep." 40–42.  Between Lilya's opt out in 2003 and the 2013 audit, the Fund never demanded contributions from Ferguson on Lilya's behalf.  Melgaard Dep. 37; Wagner Decl. [Docket No. 34] ¶ 3. According to Lilya, "[s]ince October 2003, I have not received any enrollment paperwork, identification cards, or any other documentation that led me to believe I was covered under the Plan."  Lilya Decl. ¶ 5.

### 2.  2012–2013 Hires

In late 2012 and early 2013, Ferguson hired six individuals whose terms of employment were governed by the CBA:  Bradley Warmka, Donald Dinnetz, Mathew Stamey, Mark Swenberger, Bradley Zitzloff, and Michael Worm.  Draper Decl. ¶ 4.  Because of the high premiums, each of these individuals expressed an interest in declining coverage under the Fund. Id. ¶ 5.  Ferguson, after reviewing the SPD, advised these individuals that they could waive coverage under the Fund; all six individuals decided to waive coverage.  Id.  Ferguson created and issued waiver forms for each employee, notifying the Fund that these employees were waiving coverage pursuant to Section 1.2 of the SPD.  Id. ¶ 6, Ex. 1.  In lieu of Fund coverage, the six employees elected to receive benefits under Ferguson's own self-insured plan.  Draper Dep. 107:8–17; 115:55–56.

On January 29, 2013, the Fund's legal counsel notified Ferguson that the Fund was rejecting the employees' waivers.  Id. Ex. 2.  The notification, however, stated that the Fund would consider the waivers if the employees provided "written evidence detailing the other group [coverage]."  Id.  The Fund followed with an additional letter on April 8, 2013, stating that

waivers would not be permitted unless the employees seeking waiver met the "limited individual voluntary termination requirements." Id. Ex. 3. Enclosed with the letter was a July 25, 2007 memorandum from Trustees Melgaard and Skagerberg adopting the limited individual voluntary termination guidelines ("Termination Procedure"). Id. Pursuant to the Termination Procedure, an individual could terminate Fund coverage if he or she obtained coverage under a spouse's plan and the individual's union and employer completed a written agreement. Id. The Termination Procedure provided language to be incorporated into CBAs regarding termination:

> The Union and Employer, which are parties to this agreement, hereby agree that the Rules and Regulations of the Minneapolis and Suburban Lumber Dealers Trust for Voluntary Termination of Health and Welfare Coverage by Individual Participants are incorporated by reference. The parties, including the members of the union agree to be bound by such rules and regulations, and any amendments thereto.

Id. Ferguson denies receiving a copy of the Termination Procedure prior to getting the April 8, 2013 letter. Id. ¶ 8.

### 3. 2013 Audit

In July 2013, the Fund audited the Ferguson account. Hayes Aff. [Docket No. 22] Ex. 1. Pursuant to the audit, the Fund determined that Ferguson owed contributions on behalf of William Lilya (from November 2003 until present) and for the six individuals hired in 2012 and 2013 who allegedly waived coverage under Section 1.2 of the SPD. Id.

### D. The Action

The Fund filed this Employee Retirement Income Security Act ("ERISA") action on March 27, 2014, seeking unpaid contributions related to Lilya and the six employees hired in 2012–2013 who waived coverage. See Compl. According to the Funds's calculations through April 14, 2015, the date of the hearing on these motions, Ferguson owes the following

contributions: (1) $138,680.88 for Lilya; (2) $29,890.80 for Dinnetz; (3) $44,049.60 for Stamey; (4) $34,610.40 for Swenberger; (5) $44,049.60 for Warkma; (6) $37,756.80 for Worm; and (7) $1,573.20 for Zitzloff, totaling in $330,611.28. Hayes Aff. Ex. 3. Additionally, the Fund claims interest accrued of $82,383.48 and liquidated damages in the amount of $104,041.44. Id. In total, the Fund seeks an award of $517,036.20. Id. Ferguson contends that language in the SPD explicitly allowed for the 2012-2013 employees to waive Fund benefits and the Fund's claims pertaining to Lilya are barred by laches and the relevant statute of limitations. Both parties move for Summary Judgment.[3]

## III. DISCUSSION

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). However, the nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (citations omitted).

_____

[3] The Fund's claims are pled as (1) breach of contract; (2) breach of a plan governed by the Employee Retirement Income Security Act ("ERISA") pursuant to ERISA § 515; and (3) account stated. Compl. ¶¶ 15–24. However, as Ferguson correctly notes, to the extent the Fund is attempting to pursue state law claims for "breach of contract" and account stated," such claims are preempted by ERISA. Ibson v. United Healthcare Services, Inc., 776 F.3d 941 (8th Cir. 2014) (finding that when the plan in question was governed by ERISA, state law claims for breach of contract, negligence, and bad faith were preempted by ERISA). As such, the only claim remaining at issue here is for delinquent contributions pursuant to § 515 of ERISA. 29 U.S.C. 1145.

If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate. Id. However, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . . Instead, 'the dispute must be outcome determinative under prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citations omitted).

## B.  2012–2013 Hires

Turning first to the six individuals hired by Ferguson in 2012–2013, Ferguson contends that the waiver terms of the SPD were incorporated by reference into the CBA and therefore these employees properly waived coverage. The Fund responds that the unambiguous terms of the CBA require contributions for these employees. Additionally, the Fund asserts that § 515 of ERISA allows for only limited defenses to contribution claims and Ferguson's waiver defense is not applicable here.

### 1. Defenses Under § 515

Section 515 of ERISA governs claims concerning the non-payment of fund contributions. Section 515 states:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. Accordingly, a fiduciary may initiate a civil action on behalf of a fund to enforce the mandates of § 515 and collect damages. See Bituminous Coal Operators' Ass'n v. Connors, 867 F.2d 625, 633 (D.C. Cir. 1989) (stating that § 515 "creates a federal right of action independent of the contract on which the duty to contribute is based"). These damages can include unpaid contributions, interest, liquidated damages, and attorneys' fees. See 29 U.S.C. §

1132(a), (g)(2).

Section 515 was intended to "simplify actions to collect delinquent contributions, avoid costly litigation, and enhance the actuarial planning necessary to the administration of multiemployer pension plans." Cent. States, Se. & Sw. Areas Pension Fund v. Indep. Fruit & Produce Co., 919 F.2d 1343, 1348 (8th Cir. 1990) (citations omitted). "Prior to the enactment of section 515 in 1980, collection actions brought by plan trustees were often converted into complex and costly litigation involving various contract formation defenses." Id. As nonparties to collective bargaining agreements, funds were normally considered third party beneficiaries of CBAs under common law contracting principles. Thus, funds were exposed to "any contract defense which the promisor could assert against the promisee if the promisee were suing on the contract." Id. (quoting Sw. Adm'rs, Inc. v. Rozay's Transfer, 791 F.2d 769, 773 (9th Cir. 1986)). With these defenses being raised in the context of collection actions, funds were often damaged by litigation costs and, when employers prevailed, were left without expected contributions. See Bakery and Confectionery Union and Inds. Intern. Pension Fund v. Ralph's Grocery Fund, 118 F.3d 1018, 1021 (4th Cir. 1997).

Courts have therefore limited the defenses available in contribution actions, with the Eighth Circuit traditionally recognizing "only two defenses to a collection action: that the pension contributions are themselves illegal or that the collective bargaining agreement is void." Indep. Fruit & Produce Co., 919 F.2d 1343 at 1349 (citing Benson v. Brower's Moving & Storage, 907 F.2d 310, 314 (2d Cir. 1990)).[4] "If it means nothing else, [§] 515 means that . . .

---

[4] Other circuits have recognized additional defenses in § 515 actions. See Agathos v. Starlite Motel, 977 F.2d 1500, 1505 (3d Cir. 1992) (noting three recognized defenses: (1) the pension contributions themselves are illegal; (2) the collective bargaining agreement is void ab

suit [by a trustee] cannot be thwarted by defenses not apparent from the face of the Agreement."
Id. (quoting Bituminous Coal Operators' Ass'n, 867 F.2d at 634).  To resolve contribution
claims, the Court must therefore examine the terms of the CBA.  Cent. States, Se. & Sw. Areas
Pension Fund v. Kroger Co., 73 F.3d 727, 730–31 (7th Cir. 1996) ("It is the collective bargaining
and contribution agreements [that] establish the employer's obligation to the pension fund."
(internal citations omitted)).

The Fund argues that because the defenses permitted under § 515 are narrow, § 515
precludes Ferguson from asserting the SPD waiver language argument.  Ferguson counters that
the waiver defense is not the type prohibited under § 515 and that it is apparent "on the face of
the CBA due to the incorporation by reference language."  Def.'s Mem. Opp'n to Pl.'s Mot.
Summ. J. [Docket No. 40] 24.

The Court agrees with Ferguson that the waiver defense raised here is not a defense
precluded under § 515.  Although the Eighth Circuit has explicitly referenced limited defenses to
a § 515 action, it has also unequivocally stated that funds may only seek to collect contributions
from an employer when the employer is contractually obligated to pay those contributions.  See
Carpenters Fringe Benefit Funds of Ill. v. McKenzie Eng'g, 217 F.3d 578, 582 (8th Cir. 2000)

initio; and (3) the employees have voted to decertify the union as its bargaining representative).
Several courts have further recognized a "termination defense"—claiming that an employer was
not required to make contributions because the CBA had purportedly been terminated.  See e.g.,
Laborers Pension Trust Fund–Detroit & Vicinity v. Interior Exterior Specialist Constr. Group,
Inc., 394 Fed. Appx. 285 (6th Cir. 2010) (allowing a defendant to assert a termination defense);
La. Bricklayers & Trowel Trades Pension & Welfare Fund v. Alfred Miller Gen. Masonry
Contracting Co., 157 F.3d 404 (5th Cir. 1998) (stating that courts may consider a termination
defense as long as the inquiry is superficial).  However, in Twin City Pipe Trade Servs. Ass'n,
Inc. v. Frank O'Laughlin Plumbing & Heating Co., the Eighth Circuit recently declined to
explicitly recognize a termination defense because "the circumstances involved [in that case]
would not support such a defense in any event."  759 F.3d 881, 885 (8th Cir. 2014).

("Under ERISA § 515, the Funds may collect only those contributions that [the employer] is contractually obligated to pay.") (citation omitted). Other courts have similarly confirmed this conclusion. See DeVito v. Hempstead China Shop, Inc., 38 F.3d 651, 653–54 (2d Cir. 1994) (stating that when the contributions demanded are not in accordance with terms and conditions of a CBA, a fund cannot seek to enforce a nonexistent contractual obligation); Teamsters Indus. Empl. Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 138 (3d Cir. 1993) ("Although a variety of contract defenses would not preclude [plaintiffs] from enforcing their right to collect payments pursuant to the collective bargaining agreement, [they] are not entitled to enforce a nonexistent contractual obligation."); Bd. of Tr., Sheet Metal Workers' Nat. Pension Fund v. DCI Signs & Awnings, Inc., No. 8-15, 2008 WL 4329294, at * 5 (E.D. Va. Sept. 15, 2008) ("Section 515 does not mean, however, that multiemployer funds may enforce a nonexistent contractual obligation." (quotation and citation omitted)).

Here, Ferguson's defense is not related to contract formation. Ferguson is not, for example, arguing that it maintained an all together separate and different oral understanding of the CBA with the Union. See e.g., Central States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., 870 F.2d 1148, 1153–54 (7th Cir. 1989) (rejecting a defense to a contribution claim based on an oral agreement between parties to not enforce terms of the CBA for certain employees). Rather, Ferguson argues that the explicit terms of the SPD allow for individual waiver and therefore it is not required to provide contributions for those individuals who properly waived coverage under the CBA.

While recognizing the purpose of § 515 as preventing contract formation defenses, this section of ERISA is not so narrow as to prevent Ferguson from raising this defense. However, as

noted below, the Court need not rule on whether the CBA incorporated the SPD waiver language because, even if it did, the Fund remains entitled to collect contributions for the six individuals under the unambiguous language of the CBA.

### 2. Interpretation of the CBA and Governing Documents

The Fund argues that the unambiguous language of the CBA requires Ferguson to provide and contribute to the cost of health and welfare benefits exclusively through the Fund for all union employees who have worked for Ferguson for a designated time period. According to the Fund, because Ferguson violated this unambiguous provision by enrolling the six union employees who waived coverage in 2012 and 2013 in Ferguson's <u>own</u> benefit plan, Ferguson is contractually obligated to make contributions. Summary judgment to the Fund could be awarded, it is argued, for this narrow reason alone and whether or not the SPD is incorporated into the CBA to allow for employee waiver need not be determined. Ferguson, in contrast, focuses on the CBA provision which expressly incorporates the SPD waiver terms, arguing that the Fund's attempts at circumventing the waiver language should be rejected.

As noted above, in a § 515 collection action, a multiemployer fund "can enforce, as written, the contribution requirements found in the controlling documents." <u>Bakery and Confectionery Union and Indus. Intern. Pension Fund</u>, 118 F.3d at 1021. Accordingly, "[f]or plaintiffs to prevail on their claim for summary judgment under Section 515—and to survive defendant's cross-motion—they must show that the Agreement creates an unambiguous contractual obligation on the defendants to make contributions pursuant to the contended provisions." <u>Trustees of the Bricklayers and Allied Craftworkers, Local 5. v. Charles T. Driscoll Masonry Restoration Co., Inc.</u> 165 F. Supp. 2d 502, 510 (S.D.N.Y. 2001).

Whether a CBA is ambiguous is a question of law.  <u>Indep. Fruit & Produce</u>, 919 F.2d at 1349.  If a contract can be reasonably interpreted in more than one manner, then it is ambiguous.  <u>Id.</u>  When examining terms of a CBA governed by ERISA, courts apply federal common law principles of contract interpretation.  <u>Harris v. Epoch Group, L.C.</u>, 357 F.3d 822, 825 (8th Cir. 2004).  Words are to be awarded their plain and ordinary meaning as understood by a reasonable, average person.  <u>Reed v. Insituform Techs., Inc.</u>, 994 F. Supp. 2d 1022, 1027 (D. Minn. 2014) (citing <u>Indep. Fruit & Produce</u>, 919 F.2d at 1349)).  If the language is plain and unambiguous, it is not appropriate to evaluate extrinsic evidence.  <u>Id.</u> (citing <u>Excel Corp. v. United Food & Commercial Workers Int'l Union, Local 431</u>, 102 F.3d 1464, 1468 (8th Cir. 1996)).

Article 15 of the CBA governs the health and welfare benefits provided to Ferguson's union employees:

> All benefits set forth in this section shall fall under the <u>Minneapolis And Suburban Lumber Dealers Trust Medical, Dental, Life & AD&D Benefit Plan</u>, hereinafter referred to as the "Trust".  The Employer shall provide group insurance benefits for each regular employee who has worked for the Company seventy-five (75) calendar days or longer.  Such coverage to start the first of the month closest to the seventy-five (75) day period.  Provided, however, that where a covered employee leaves the employment of his employer and is subsequently employed within thirty (30) calendar days by another employer participating the same insurance Trust, such employee's coverage shall become effective on the first day of his new employment.  Such coverage shall be as set forth in the Trust.

CBA Article 15. A (emphasis in original).  The CBA defines "Employer" and "Company" as Ferguson.  <u>Id.</u> at 1.  "Employees" under the CBA are defined as "Union or Bargaining Unit employees only."  <u>Id.</u>  This provision requires that Ferguson provide "group insurance benefits" for each union member employed by Ferguson for seventy-five days or longer and that such benefits must be awarded exclusively through the Fund.  This language is clear on its face.  Since there is no other reasonable interpretation of this clause, it is unambiguous.

Ferguson admits that it began providing prospective new hires with benefit options because of the coverage expense under the Fund. As stated by Michael Draper, Ferguson's 30(b)(6) representative, "We provided options, one of which was to enroll in the plan, one of which was to waive total insurance and not take any insurance, one of which was to waive the medical plan and have the ability to enroll in the Ferguson plan." Draper Dep. 105:17–22. It is undisputed that the employees hired between 2012 and 2013 who waived Fund coverage all elected to obtain coverage under Ferguson's own benefit plan.[5] Draper Dep. 107:8–17; 115:55-6. Additionally, there appears to be no dispute that these six individuals hired in 2012 and 2013 who ultimately waived coverage under the Fund were bargaining unit members. As the CBA is a negotiated document between the Union and Ferguson governing the benefits, rights, and conditions of Ferguson's union employees, the conclusion here is inescapable: Ferguson violated the CBA by enrolling the 2012–2013 union employees in its own self-insured benefits plan rather than the Fund. To the extent Ferguson is providing benefits to its union employees in accordance with the CBA, the benefits <u>all</u> must be provided <u>under</u> the Fund.

Ferguson's argument that the CBA and the SPD should be read together as controlling documents is well taken. The SPD document is labeled as "an employee welfare benefit plan within the meaning of the ERISA" and § 515 explicitly provides that an employer participating in a multiemployer plan must make "contributions in accordance with the terms and conditions <u>of such plan or such agreement</u>." 29 U.S.C. § 1145 (emphasis added). Moreover, courts have found that a clear and unambiguous reference to a plan document in a CBA serves as an effective

_____

[5] One of these six employees, Bradley Zitzloff, is no longer employed by Ferguson and therefore does not receive coverage under Ferguson's plan. Draper Dep. 115:5–10.

incorporation by reference of that plan.  See e.g., Teamsters Local Union No. 783 v. Anheuser-Busch, Inc., 626 F.3d 256, 262 (6th Cir. 2010) ("Terms are incorporated by reference into a CBA where the underlying contract makes clear reference to a separate document, the identity of the separate document may be ascertained, and incorporation of the document will not result in surprise or hardship." (internal quotation omitted)).  The incorporation language set forth in the CBA here is clear and specifically refers to the "Trust" (referred herein as the "SPD")—"Such coverage shall be as set forth in the Trust."

However, even if the Court were to conclude that the SPD was incorporated by reference, the Court's ultimate conclusion remains the same.  That is, nothing in the plain language of the SPD that references an employee's waiver ability overrides, or even conflicts with, the CBA's mandate that Ferguson may only supply benefits to bargaining unit employees through participation in the Fund.  The SPD refers only to a participant's right to waive generally: "**Coverage Waiver**:  An Eligible Employee may decline coverage ("waive") under the Plan. Such an Eligible Employee shall be provided with the appropriate notice required under HIPAA regarding waiver of group health coverage."  SPD Section II, § 1.2.  Giving this language its plain and ordinary meaning, it allows for an employee to decline coverage.  The language does not, however, confer on Ferguson an additional right to provide benefits under its own plan outside the Fund.  This conclusion could potentially be different if, for example, the 2012–2013 individuals waived coverage under the Fund and then elected coverage from a spouse or elected no coverage at all.  These waivers would not explicitly conflict with the terms of the CBA.

The Court concludes the unambiguous terms of the CBA required that, to the extent Ferguson supplied health benefits to union employees during the time of the audit, the benefits

must "fall under" the Fund. The waiver language in the SPD does not disrupt this requirement. No issue of material fact remains. Ferguson admits that it supplied benefits to the six union employees, whose terms of employment and benefit coverage came under purview of the CBA, through its own self-insured Fund. The Fund is entitled to summary judgment as it relates to these six employees.

## C. William Lilya

The Fund additionally seeks contributions on behalf of Ferguson employee William Lilya. In October 2003, Lilya opted out of fund coverage and elected to receive benefits pursuant to his spouse's benefit plan. The parties agree that the SPD's waiver provisions are not applicable here because Lilya was enrolled in the Fund for at least some period of time before "opting out." Draper Decl. ¶ 5. Ferguson's defense is that the equitable doctrine of laches and the relevant statute of limitations prohibit the Fund from seeking contributions on Lilya's behalf because the union was effectively notified of Lilya's opt out in a 2003 remittance report. Ferguson prevails under either theory.[6]

### 1. Laches

Although the defenses related to a § 515 contribution claim are limited, Courts have "recognized that affirmative defenses like these [referencing a laches argument], which focus on the actions of the Funds as opposed to the formation and enforcement of the CBA, may not be foreclosed under section 515." Trs. of Local 813 Ins. Trust Fund v. Wilner's Livery Serv., Inc.,

---

[6] Ferguson additionally asserted the equitable defenses of waiver and estoppel in its briefing. The Court, however, declines to make an explicit ruling on such defenses given the finding that the claim brought for the Lilya contributions is barred under both the doctrine of laches and the statute of limitations.

No. 11-3180, 2012 WL 4327070, at * 6 (E.D.N.Y. Sept. 19, 2012) (collecting cases). As Ferguson's equitable defense argument relates to actions of the Fund, even in the context of § 515 the laches defense may be evaluated.

The doctrine of laches precludes the Fund from recovering contributions for Lilya. Laches consists of two elements: "(1) unreasonable delay by the plaintiff in filing suit and (2) undue prejudice to the defendant caused by the delay." Hurst v. U.S. Postal Service, 586 F.2d 1197, 1199–1200 (8th Cir. 1978) (citing Costello v. United States, 365 U.S. 265, 282 (1961)). Both elements are satisfied here.

The Fund's delay of over ten years in asserting this action to collect contributions for Lilya is unreasonable. In making this evaluation, courts look to "(1) the length of the delay, measured from the time the plaintiff knew or should have known about his potential cause of action, and (2) whether the plaintiff's delay was reasonable, including whether the plaintiff has proffered a legitimate excuse for his delay." Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 997 (9th Cir. 2006) (citing Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 838 (9th Cir. 2002)). It is undisputed that Ferguson submitted a monthly remittance report in November of 2003 that designated in two separate places that Ferguson would no longer be making contributions on behalf of Lilya, noting specifically that Lilya had "waived all coverage." See Remittance Report. The Court finds this notification as the sufficient point in time for when the Fund "knew or should have known" of Ferguson's failure to contribute on behalf of Lilya.

The Fund focuses on Ferguson providing notice "through a backroom operations report," arguing that Ferguson "has not conclusively demonstrated that the administrator fully understood the report submitted, and it is not impossible that an employee of the administrator could have

misunderstood the notations with respect to Lilya." Pl.'s Mem. Opp'n Mot. Summ. J. [Docket No. 38] 19, n.7. These arguments are without merit. The notification regarding Lilya's waiver was transcribed on a monthly remittance report—the business record utilized by the Fund to track contributions and payments. Courts have found such reports sufficient to adequately place a Fund on notice regarding potential causes of action. See Cent. States, Se. & Sw. Areas Pension Fund v. Ecko Prods. Inc., 581 F. Supp. 374 (N.D. Ill. 1984) (monthly remittance reports placed the fund on notice of potential claims). Moreover, the Fund's own actions reflect its knowledge that Lilya was no longer enrolled. The Fund does not dispute Lilya's own contention that "[s]ince October 2003, I have not received any enrollment paperwork, identification cards, or any other documentation that led me to believe I was covered under the Plan." Lilya Decl. ¶ 5. If the fund considered Lilya enrolled, it would have continued relevant correspondence with Lilya, such as providing SPDs, identification cards, or open enrollment materials. Given the fact that the Fund knew, or at the very least, should have known of Lilya's waiver in 2003 and that it has offered no reasonable explanation of its delay in asserting this action, the Fund's ten year delay is unreasonable.

The second element of prejudice is likewise satisfied. Since Lilya's opt out ten years ago, the Fund has changed administrators and no longer has any records related to the opt out (except for the remittance report referenced above). Ferguson also has no additional records. The Court agrees with Ferguson's contention that "[h]ad Ferguson known that the Fund was going to seek 10 years' worth of contributions on Lilya's behalf, it surely would have either exited the Fund altogether, or sought to clarify Lilya's status and the parties' respective rights and responsibilities." Def. Mem. Supp. Mot. Summ. J. [Docket No. 31] 25. The Fund's delay

has severely prejudiced Ferguson's attempt to defend any contribution claim related to Lilya.  In sum, the doctrine of laches precludes the Fund from recovering Lilya's contributions.

### 2.  Statute of Limitations

Ferguson further argues that the Fund is barred from recovering any contributions on behalf of Lilya under the relevant statute of limitations.  The Court agrees.

"ERISA does not . . . contain a statute of limitations applicable to trustee actions to recover delinquent contributions."  Robbins v. Iowa Road Builders Co., 828 F.2d 1348, 1353 (8th Cir. 1987).  Accordingly, the Eighth Circuit has concluded that the most analogous statute of limitations from the forum state should be applied in the context of an ERISA action.  Id.  The most analogous state action to a suit for recovery of delinquent contributions is an action for breach of contract.  Berger Transfer & Storage, Inc. v. Cent. States, Se. and Sw. Areas Pension Fund, 1994 U.S. Dist. LEXIS 21071, *7 (D. Minn. 1994) (citing Robbins, 828 F.2d at 1353–55). Under Minnesota law, the statute of limitations for a breach of contract action is six years. Minn. Stat. § 541.05.

While state law designates the limitations period, courts generally look to federal law to determine when the claim accrued.  Connors v. Hallmark & Son Coal Co., 935 F.2d 336, 341 (D.C. Cir. 1991) (citations omitted).  "A limitations period accrues when a claimant knows, or should know through an exercise of reasonable diligence, of the acts constituting the alleged violation."  Alcorn v. Burlington Northern R.R. Co,, 878 F.2d 1105, 1108 (8th Cir. 1989) (citations omitted).  "An obligation to exercise due diligence arises when the information available to the putative claimant is sufficient to put him or her on notice that an injury may be discovered."  Berger Transfer & Storage Inc., 1994 U.S. Dist. LEXIS 21071 at *17 (citing

Connors, 935 F.2d at 343).

Here, for the reasons explained in the doctrine of laches discussion, the November 2003 remittance report is the point in time when the Fund knew or should have known through exercise of reasonable diligence that Lilya was opting out of Fund coverage. See Mich. United Food & Commercial Workers Unions etc. v. Muir Co., 992 F.2d 594 (6th Cir. 1993) (barring a fund's claim under a statute of limitations and finding that the statute of limitations began to run when the fund possessed remittance reports depicting discrepancies). Applying this date, the statute of limitations began to run in November 2003, and any claim raised related to the Lilya contributions after November 2009 is time barred. This action was not filed until March 27, 2014.[7]

## IV. CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1.    Plaintiff Midwest Construction & Distribution Industry Benefit Trust's Motion
      for Summary Judgment [Docket No. 20] is **GRANTED in part** and **DENIED in**

---

[7] Ferguson first raised its statute of limitations argument in its initial memorandum in support of its Motion for Summary Judgment. See Def. Mem. Supp. Summ. J. [Docket No. 31] 23, n.10. At oral argument, for the first time, the Fund argued that even if the statute of limitations began to run in November 2003, it would still be entitled to a portion of contributions for Lilya based on the "installment rule." The Fund cited to Honn v. Nat'l Computer Sys., Inc., wherein the Supreme Court of Minnesota held that when a monetary obligation is payable in individual installments, a separate cause of action arises pertaining to each installment and the statue of limitations begins to run against each installment when it is due. 311 N.W.2d 1 (Minn. 1981). Several circuits have declined to adopt such reasoning in the context of ERISA cases where an plan beneficiary sues for unpaid disability benefits and the Court likewise declines to do so here. See Riley v. Metro. Life Ins. Co., 774 F.3d 241, 246 (1st Cir. 2014) ("[W]e reject [the plaintiff's] argument that the ERISA plan must be treated as a continuing violation or as an installment contract, with a new accrual date starting a new limitations period for each payment. We join the three other circuits which have squarely confronted and rejected the plaintiff's accrual theory in this ERISA context.").

**part**.

    A.       To the extent Plaintiff seeks contributions for the six 2012–2013 employees, the motion is **GRANTED**. Plaintiff is entitled to $191,930.40 in unpaid contributions, $18,948.70 in accumulated interest, and $36,962.88 in liquidated damages for a total of $247,841.98.[8]

    B.       To the extent Plaintiff seeks contributions for employee William Lilya, the motion is **DENIED**.

2.      Defendant Ferguson Enterprises, Inc.'s Motion for Summary Judgment [Docket No. 20] is **GRANTED in part** and **DENIED in part**.

    A.       To the extent Defendant seeks dismissal of the claim for contributions owed for the six 2012–2013 employees, the motion is **DENIED**.

    B.       To the extent Plaintiff seeks dismissal of the claim for contributions owed for William Lilya, the motion is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

                BY THE COURT:


                _____s/Ann D. Montgomery_____
                ANN D. MONTGOMERY
                U.S. DISTRICT JUDGE

Dated: July 14, 2015.

---

[8] These calculations were taken from the affidavit of Cindy Hayes and represent the totals owed on account of employees Bradley Warmka, Donald Dinnetz, Mathew Stamey, Mark Swenberger, Bradley Zitzloff, and Michael Worm as of the date of the hearing on these motions, April 14, 2015. See Hayes Aff. Ex. 3.